# EXHIBIT 7

To Progressive Select Insurance Company's Motion to Dismiss
the First Amended Complaint Filed Against It

CS/CS/H.B. 119, H.R., Final Bill Analysis (Mar. 19, 2012)

## HOUSE OF REPRESENTATIVES
## FINAL BILL ANALYSIS

| | | |
|---|---|---|
| **BILL #:** | CS/CS/HB 119 (CS/CS/SB 1860) | **FINAL HOUSE FLOOR ACTION:** |
| **SPONSOR(S):** | Economic Affairs Committee; Insurance & Banking Subcommittee; Boyd; and others (Budget; Banking and Insurance; Negron | 80 Y's    34 N's |
| **COMPANION BILLS:** | CS/CS/SB 1860 | **GOVERNOR'S ACTION:** Pending |

## SUMMARY ANALYSIS

CS/CS/HB 119 passed the House on March 9, 2012, and subsequently passed the Senate on the same day. The bill provides for changes in personal injury protection (PIP) coverage, which is no-fault motor vehicle insurance.

Under the bill, to be eligible for no-fault medical benefits, persons injured in motor vehicle accidents are required to receive initial treatment and care within 14 days from specified providers. Up to $10,000 in medical benefits is available for emergency medical conditions; up to $2,500 in medical benefits is available for non-emergency medical conditions.

The bill retains aspects of the current PIP system and provides for various changes, including the following:
- Providing for PIP insurers to make rate filings by October 1, 2012, and January 1, 2014, that decrease premium rates by at least 10 percent and 25 percent, respectively.
- Providing that the PIP funeral benefit of $5,000 is in addition to medical and disability benefits.
- Excluding massage and acupuncture from covered medical benefits.
- Requiring health care clinics that seek PIP reimbursement to be licensed, with specified exceptions.
- Authorizing a direct-support organization to combat motor vehicle insurance fraud.
- Amending the PIP schedule of maximum charges; requiring insurers to include the schedule in their forms; permitting use of Medicare coding policies.
- Providing that an insurer's failure to timely pay PIP claims as a general business practice is an unfair and deceptive trade practice.
- Tolling the PIP payment period when fraud is reasonably suspected.
- Requiring insureds to comply with all policy terms, including requests for examination under oath.
- Creating a rebuttable presumption that the failure to appear for two mental or physical examinations constitutes an "unreasonable refusal" to submit to examination.
- Prohibiting the use of contingency risk multipliers; providing guidelines for judges to consider in determining whether the amount of an attorney fee award is appropriate.
- Revoking the license of health care practitioners found guilty of insurance fraud for five years.
- Amending crash report forms.
- Specifying certain actions that constitute fraud.

The bill appropriates $200,000 from the Insurance Regulatory Trust Fund to be used by the Office of Insurance Regulation to contract with an independent consultant to determine the expected savings from this legislation. As the bill addresses cost drivers in PIP, consumers should realize savings on no-fault premiums.

Subject to the Governor's veto powers, the effective date of the bill is July 1, 2012, except as otherwise provided.

This document does not reflect the intent or official position of the bill sponsor or House of Representatives.
STORAGE NAME: h0119z.INBS.DOCX
DATE: March 19, 2012

PAGE: 1

# I. SUBSTANTIVE INFORMATION

A. EFFECT OF CHANGES:

## Background

### Motor Vehicle Accident Reports

For motor vehicle accidents, s. 316.066, F.S., provides for the filing of a Long-Form or Short-Form Crash Report. The more detailed long-form report must be completed by a law enforcement officer only when the accident:
- results in personal injury or death; or
- involves a hit and run or intoxicated driver.

Completed long-form reports must be filed with the Florida Department of Highway Safety and Motor Vehicles (DHSMV). In other cases, a short-form report may be completed by a law enforcement officer or the parties involved in the accident. Short-form reports prepared by law enforcement officers are maintained by the local law enforcement agency and are not submitted to the DHSMV.

### No-Fault Motor Vehicle Insurance

Florida's Motor Vehicle No-Fault Law (the "No-Fault Law")[1] requires motorists to carry at least $10,000 of no-fault insurance, known as personal injury protection (PIP) coverage. Florida is one of 12 states[2] with no-fault motor vehicle[3] insurance provisions. The purpose of the No-Fault Law is to provide for medical, surgical, funeral, and disability insurance benefits without regard to fault. In return for assuring payment of these benefits, the No-Fault Law provides limitations on the right to bring lawsuits arising from motor vehicle accidents. Florida motorists are required to carry a minimum of $10,000 of PIP insurance and $10,000 of property damage liability coverage.[4,5]

## Florida's PIP System

### Legislative History

In 1971, Florida became the second state in the country to adopt a no-fault motor vehicle insurance plan, which took effect January 1, 1972. Since its enactment, various changes have been made to the No-Fault Law.

In 2000, a Statewide Grand Jury found rampant fraud in the PIP system. Reform legislation was enacted in 2001,[6] which adopted many of the Grand Jury's recommendations. These included requiring certain health care clinics to register with the Department of Health and providing criteria for medical directors; applying fee schedules for specified procedures; limiting access to motor vehicle crash reports to curtail illegal solicitation; and providing that insurers/insureds are not required to pay claims of brokers.

---

[1] Sections 627.730-627.7405, F.S.
[2] Michigan, New Jersey, New York, Pennsylvania, Hawaii, Kansas, Kentucky, Massachusetts, Minnesota, North Dakota, and Utah also have no-fault automobile insurance. The systems in New Jersey, Pennsylvania, and Kentucky are sometimes separately categorized as "choice" no-fault states, as motorists in these states have the option to reject the no-fault limitation on lawsuits and retain the right to sue for their injuries. See the Insurance Information Institute's update on "No-Fault Auto Insurance." *Available at*: http://www.iii.org/media/hottopics/insurance/nofault/ (last visited Jan. 23, 2012).
[3] "Motor vehicle" is defined in s. 627.732, F.S., and includes private passenger motor vehicles and commercial motor vehicles.
[4] Section 627.7275, F.S.
[5] Under Florida's Financial Responsibility Law (ch. 324, F.S.), motorists must also provide proof of ability to pay monetary damages for bodily injury and property damage liability at the time of motor vehicle accidents or when serious traffic violations occur.
[6] Chapter 2001-271, L.O.F.

Additional changes were enacted in 2003.[7] These included strengthening health care clinic regulation; requiring clinic licensure with the Agency for Health Care Administration (AHCA); requiring all PIP claimants to send a pre-suit demand letter to insurers for unpaid benefits; specifying criteria as to "reasonable" charges for services; strengthening various criminal penalties for PIP fraud; and providing for the repeal of the No-Fault Law on October 1, 2007, unless reenacted by the Legislature during the 2006 Regular Session.

In 2006, CS/CS/CS SB 2114, a bill that would have extended the sunset date of the No-Fault Law and made other changes, was passed by the Legislature and subsequently vetoed. The No-Fault Law then sunset on October 1, 2007.[8]

In Special Session C of 2007, the Legislature passed CS/HB 13C, which revived and reenacted the No-Fault Law effective January 1, 2008. The bill, signed into law as ch. 2007-324, L.O.F., limits medical reimbursement to services and care provided by specified health care providers and entities; authorizes insurers to use a schedule of maximum charges in calculating reimbursement for medical services, supplies, and care; and provides that an insurer's failure to pay PIP claims as a general business practice is an unfair and deceptive trade practice.

**Current Provisions**

PIP provides $10,000 of coverage (per person) for bodily injury sustained in a motor vehicle accident by the named insured, relatives residing in the same household as the named insured, persons operating the insured motor vehicle, passengers in the insured motor vehicle, and persons struck by the motor vehicle. PIP benefits are payable as follows:
- 80 percent of reasonable medical expenses.
- 60 percent of loss of income.
- Death benefit of $5,000 or the remainder of unused PIP benefits, whichever is less.

PIP provides the policyholder with immunity from liability for economic damages (medical expenses) up to the $10,000 policy limits and for non-economic damages (pain and suffering) for most injuries. Specifically, the immunity provision protects the insured from tort actions by others (and conversely, the insured may not bring suit to recover damages) for pain, suffering, mental anguish, and inconvenience arising out of a vehicle accident, except in the following cases:[9]
- Significant and permanent loss of an important bodily function.
- Permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement.
- Significant and permanent scarring or disfigurement.
- Death.

Lawsuits for pain and suffering may commence only if the injuries meet these threshold levels.

PIP insurance benefits are payable by the insurer within 30 days after receipt of a covered loss and the amount due. Benefits not paid within this time are overdue.[10] Before filing a lawsuit for overdue PIP benefits, the aggrieved person must give the insurer written notice of intent to sue.[11] If the insurer pays the claim (with interest and penalty) within 30 days of receipt of the pre-suit demand letter, a lawsuit cannot be brought against the insurer.

---

[7] Chapter 2003-411, L.O.F.
[8] The Motor Vehicle No-Fault Law was repealed pursuant to s. 19, ch. 2003-411, F.S.
[9] Section 627.737, F.S.
[10] Section 627.736(4)(b), F.S.
[11] Section 627.736(10), F.S.

**Providers and Entities Eligible for PIP Reimbursement**

Pursuant to s. 627.736, F.S., PIP provides medical reimbursement for services and care lawfully provided, supervised, ordered, or prescribed by a licensed physician, osteopath, chiropractor or dentist *or* provided by the following persons or entities:

- a hospital or ambulatory surgical center;
- an ambulance or emergency medical technician that provides emergency transport and treatment;
- an entity wholly owned by physicians, osteopaths, chiropractors, dentists, or such practitioners and their spouse, parent, child, or sibling;
- an entity wholly owned by a hospital or hospitals;
- licensed health care clinics that are accredited by a specified accrediting organization;
- licensed health care clinics that:
    - have a medical director that is a Florida licensed physician, osteopath, or chiropractor;
    - have been continuously licensed for more than three years or are publicly traded corporations; and
    - provide at least four of the following medical specialties: general medicine; radiography; orthopedic medicine; physical medicine; physical therapy; physical rehabilitation; prescribing or dispensing outpatient prescription medication; or laboratory services.

**Charges for Treatment and Services**

The No-Fault Law sets forth schedules of maximum reimbursement, each of which applies to specified care and services (e.g., emergency transport and treatment). For medical services, supplies, and care not addressed by a specific reimbursement schedule, the No-Fault Law provides for reimbursement at 80 percent of 200 percent of the physicians schedule of Medicare Part B,[12] developed by the Centers for Medicare and Medicaid Services (CMS). Currently, CMS develops annual fee schedules for physicians, ambulance services, clinical laboratory services, and durable medical equipment, prosthetics, orthotics, and supplies.[13]

**PIP Insurer's Right to Reimbursement**

Almost every owner or registrant of a motor vehicle required to be registered and licensed in Florida must maintain security as required by the No-Fault Law.[14] Florida law gives insurers that have paid PIP benefits the right of reimbursement against the owner or insurer of the owner of a commercial motor vehicle *if* the PIP benefits were rendered to (1) an occupant of the commercial vehicle *or* (2) a person struck by the commercial vehicle while not occupying a vehicle.[15] In other words, when an insurer provides a PIP benefit to an occupant of a commercial vehicle or someone struck by a commercial vehicle, the insurer has a right to reimbursement.

An important definition in determining whether the reimbursement provision will apply is the definition of a commercial motor vehicle. A commercial motor vehicle is defined as any motor vehicle which is not a private passenger motor vehicle.[16] A private passenger motor vehicle is defined as any motor vehicle which is a sedan, station wagon, or jeep-type vehicle and, if not used primarily for occupational,

---

[12] Medicare Part B covers doctors' services (not routine physical exams), outpatient medical and surgical services and supplies, diagnostic tests, ambulatory surgical center facility fees for approved procedures, and durable medical equipment (such as wheelchairs, hospital beds, oxygen, and walkers). Also covers second surgical opinions, outpatient mental health care, outpatient physical and occupational therapy, including speech-language therapy.
[13] The Centers for Medicare and Medicaid Services, "Fee Schedules – General Information," http://www.cms.gov/FeeScheduleGenInfo/ (last visited Jan. 23, 2012).
[14] Section 627.733(1)(a), F.S.
[15] Section 627.7405, F.S.
[16] Section 627.732(3)(b), F.S.

professional, or business purposes, a motor vehicle of the pickup, panel, van, camper, or motor home type.[17]

Many disputes have arisen over the right to reimbursement between PIP insurers and the insurers of taxicab owners, with some reaching the courts. In one case, the driver of a taxicab, who was in an accident while driving the taxicab, received PIP benefits; the PIP insurer then sought reimbursement from the taxicab owner's insurer.[18] The court found that the PIP insurer was entitled to reimbursement.[19] The court reasoned that taxicabs do not fall into the definition of a private passenger motor vehicle so taxicabs must be commercial motor vehicles.[20] In another case with similar facts, the court found that the PIP insurer was not entitled to reimbursement.[21] The court reasoned that the definition of a private passenger motor vehicle clearly included sedans and that the taxicab at question was a sedan.[22]

The insurance policies covering taxicabs do not include PIP benefits. Specifically, the security required by the No-Fault Law does not apply to owners or registrants of motor vehicles used as taxicabs.[23] Instead, owners or registrants of motor vehicles used as taxicabs are required to maintain security as provided in s. 324.032(1), F.S.[24] Further, the PIP provisions that limit rights to damages, that exempt the responsible party from tort liability, and that limit punitive damages do not apply to owners or registrants of taxicabs.[25]

### Recent Developments: Case law

**Mental and Physical Examinations of PIP Claimants**

In *Custer Medical Center v. United Automobile Insurance Co.*,[26] a passenger injured in an automobile accident failed to appear for two medical examinations requested by the insurer. At the time the requests were made, the passenger had received all medical treatment and all bills had been submitted to the insurer. Due to the passenger's failure to attend the examinations, the insurer refused to pay the entity that provided treatment. The Florida Supreme Court remanded the case for reinstatement of a decision vacating a directed verdict for the insurer on the following grounds: attendance at a medical examination is not a condition precedent to the existence of an automobile insurance policy; a dispute concerning attendance at a medical examination concerns an insured's right to receive "subsequent" PIP benefits pursuant to s. 627.736(7)(b), F.S., under an existing insurance policy, and is not a dispute about the policy's existence; additionally, s. 627.736(7), F.S., provides that when a person "unreasonably refuses" to submit to an examination, the insurer is not liable for *subsequent* PIP benefits. Here, it was not shown that the injured passenger's failure to attend medical examinations constituted an "unreasonable refusal" to submit to examination. Further, the claim sought payment for medical services that had been provided before, and not after, the passenger failed to appear for examination.

---

[17] Section 627.732(3)(a), F.S.
[18] Continental Cas. Co. v. State Farm Mut. Auto. Ins. Co., 16 Fla. L. Weekly Supp. 702a (Fla. 4th Jud. Cir. Appellate 2008)
[19] *Id.*
[20] *Id.*
[21] Jacksonville Trans. Group v. State Farm Mut. Auto. Ins. Co. (Fla. 4th Jud. Cir. Appellate 2009).
[22] *Id.*
[23] Section 627.733(1)(b), F.S.
[24] Section 324.032(1), F.S. (a) A person who is either the owner or a lessee required to maintain insurance under s. 627.733(1)(b) and who operates one or more taxicabs, limousines, jitneys, or any other for-hire passenger transportation vehicles may prove financial responsibility by furnishing satisfactory evidence of holding a motor vehicle liability policy, but with minimum limits of $125,000/250,000/50,000. (b) A person who is either the owner or a lessee required to maintain insurance under s. 324.021(9)(b) and who operates limousines, jitneys, or any other for-hire passenger vehicles, other than taxicabs, may prove financial responsibility by furnishing satisfactory evidence of holding a motor vehicle liability policy as defined in s. 324.031.
[25] *Id.*
[26] 62 So.3d 1086 (Fla. 2010).

**Recent Developments: Regulatory**

**PIP Data Call by Office of Insurance Regulation and Subsequent Report**

Early in 2011, the Florida Office of Insurance Regulation (the OIR), pursuant to s. 624.316, F.S., requested data from insurers writing personal automobile lines of business in Florida. The requested data focused on PIP claims associated with policies bearing a Florida PIP endorsement. Thirty-one companies participated in the data call, which covered a scope period from 2006-2010. Twenty-five of the participating companies represented 80.1 percent of the marketplace based on 2009 Total Private Passenger Auto No-Fault Premiums reported to the National Association of Insurance Commissioners.

On April 11, 2011, the OIR published "Report on Review of the 2011 Personal Injury Protection Data Call."[27] The report noted that over the past several years the number of drivers in Florida has remained stable, the number of accidents has decreased, but that the frequency and severity of PIP claims has increased significantly. Other findings include the following:

- The number of PIP claims opened or recorded in 2010 increased by 28 percent since 2006.
- From 2006-2010, insurers paid $8.7 billion for PIP claims and the number of PIP lawsuits pending at year end in which the insurer was the defendant increased by 387 percent.
- From 2008 to 2010, PIP benefits paid by insurers increased by 70 percent ($1.43 billion to $2.37 billion).[28]
- As of 2010, 87 percent of PIP claims opened originated in South Florida, Tampa/St. Petersburg, Northeast Florida, Southwest Florida, and Central Florida.
- PIP fraud is a significant issue, with Tampa, Miami, Orlando, Hialeah, and West Palm Beach having the highest numbers of staged accidents/questionable claims. Additionally, from July 1, 2007 to April 25, 2010, the number of PIP referrals to the Division of Fraud within the Department of Financial Services increased by more than 60 percent (from 2,669 referrals to 4,271 referrals).
- In 2010, insurers paid out over $1.04 for every premium dollar collected.
- Based on current trends, a 19 percent increase in PIP claims paid, a nine percent increase in claim severity, and a 29 percent increase in pure premium can be expected this year.
- Florida exceeds the national average for number of health care provider charges per PIP claim and the average number of procedures per claim.
- For physical medicine and rehabilitation:
  o The median number of procedures per claim increased by 59 percent from 2006 to 2010.
  o Frequency of procedures increased 22 percent.
  o The amount billed increased 173 percent from 2008 to 2010.
  o The number of massages increased 251 percent from 2007 to 2010, and the amount reimbursed for massages increased 202 percent.
- For chiropractic treatment:
  o Median number of treatments and duration of treatment decreased by 10 percent and 13 percent, respectively, since 2007, and the median frequency has remained constant.
  o The total billed amount for chiropractic manipulative treatment increased 46 percent since 2007, and total allowed reimbursement increased 23 percent.

---

[27] *Available at:* www.floir.com/siteDocuments/PIP_04-08-2011.pdf (last visited Jan. 23, 2012).
[28] Presentation on PIP fraud and overview of findings of the PIP data call report by Insurance Commissioner McCarty at the Aug. 16, 2011 meeting of the Florida Cabinet. Recording of the meeting, *available at:* http://www.myflorida.com/myflorida/cabinet/agenda11/0816/audioindex.html (last visited Jan. 23, 2012).

**Personal Injury Protection Working Group and Subsequent Report[29]**

In September and October 2011, at a series of three meetings, a PIP Working Group assembled by the Insurance Consumer Advocate (ICA) met to discuss issues of concern in the PIP system. In addition to the ICA, the working group included representatives of various system stakeholders, including hospitals, medical doctors, osteopaths, chiropractors, insurers, and attorneys. The group heard presentations on PIP fraud, results of the OIR's PIP data call, benefits and disadvantages of the current no-fault system, health care clinic licensure (and exemptions from licensure) and fraud, independent medical examinations, and delivery of emergency services, among other matters.

At the conclusion of these meetings, the ICA, in December 2011, published "Report on Florida Motor Vehicle No-Fault Insurance (*Personal Injury Protection*)." The report contains data and information collected from various sources, including the OIR, National Association of Insurance Commissioners, Insurance Research Council, National Insurance Crime Bureau, Mitchell International, Inc., other state agencies, etc. Among the reported findings:
- Strains and sprains were the most serious injury reported by 70 percent of PIP claimants.[30]
- The number of PIP claimants treated in emergency room settings declined from 57 percent in 1997 to 54 percent in 2007.[31]
- In 2010, average charges per PIP claimant (by provider) were lowest for emergency medicine ($1,613). The highest average charges per PIP claimant were by chiropractors ($3,482), acupuncturists ($3,674), and massage therapists ($4,350).[32]
- The number of new massage therapist licenses increased from 2,843 in 2010 to an estimated 4,892 in 2011.
- The percentage of PIP claimants visiting chiropractors increased from 30 percent in 1997 to 43 percent in 2007.[33]

On March 1, 2012, the ICA issued an updated report. Specifically, the report found that a large percentage of the treatment rendered in the PIP system is for soft tissue treatment (treatments associated with the modalities in the 97XXX CPT codes). More than 43 percent of the estimated total loss costs were paid for these types of treatments. It was also found that for all types of medical treatments the same modalities associated with soft tissue treatment account for 62.4 percent of medical loss costs.

<u>**Attorney Fee Awards to "Prevailing Claimants" in Litigation Against Insurers**</u>

**Lodestar Calculation**

Pursuant to s. 627.428, F.S., parties that prevail against insurers in court, including PIP claimants, are entitled to an award of reasonable attorney fees. In determining a fee award, a court calculates the

---

[29] Meeting materials, presentations and Personal Injury Protection Working Group Report available at: http://www.myfloridacfo.com/ICA/PIPWorkingGroup.htm (last visited Jan. 23, 2012).
[30] Insurance Research Council, "PIP Claiming Behavior and Claim Outcomes in Florida's No-Fault Insurance System," Feb. 2011, based on claims data for 2007.
[31] Analysis updated in Insurance Research Council, "PIP Claiming Behavior and Claim Outcomes in Florida's No-Fault Insurance System," p.11, Feb. 2011.
[32] Analysis based on information secured from Mitchell International Inc. that is representative of approximately 70 percent of the current Florida PIP insurer market share.
[33] Insurance Research Council, "Florida Auto Injury Insurance Claim Environment 2007 Final Report," Feb. 2007.

**This document does not reflect the intent or official position of the bill sponsor or House of Representatives.**
STORAGE NAME: h0119z.INBS.DOCX                                                                        PAGE: 7
DATE: March 19, 2012

lodestar, which is the reasonable number of hours the attorney worked multiplied by a reasonable hourly rate.[34]

In determining a reasonable fee, courts should consider the following factors set forth by the Florida Bar:[35]
- Time and labor required, the novelty and difficulty of the question involved, and the skill requisite to perform the legal service properly.
- The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.
- The fee customarily charged.
- The amount involved and the results obtained.
- The time limitations imposed.
- The nature and length of the professional relationship with the client.
- The experience, reputation, and ability of the lawyer(s) performing the services.
- Whether the fee is fixed or contingent.

**Contingency Risk Multiplier**

In personal injury cases in which the prevailing claimant's attorney has worked on a contingency fee basis, it is within the court's discretion whether or not to use a contingency risk multiplier of up to 2.5 times the lodestar in determining the fee award.[36] For example, if the lodestar were $20,000 and the court determined it appropriate to apply a contingency risk multiplier of 2.5, the fee award would be $50,000 ($20,000 lodestar x 2.5).

The Florida Supreme Court, in *Florida Patient's Compensation Fund v. Rowe*,[37] authorized the use of contingency risk multipliers in personal injury cases on two grounds:
- It provides personal injury claimants with increased access to courts.
- Since attorneys working on a contingency fee basis are not paid if they do not prevail, they must charge more for their services than an attorney who is guaranteed payment.

Subsequently, in *Standard Guaranty Insurance Co. v. Quanstrom*,[38] the Court clarified that use of a contingency risk multiplier was not mandatory, but was within the trial court's discretion.

In federal cases, the use of a contingency risk multiplier in computing attorney fee awards under federal fee-shifting statutes was effectively eliminated in 1987.[39]

Currently, there is a split of authority between the First and Fifth District Courts of Appeal with respect to the evidence required to support the use of a contingency risk multiplier in calculating a fee award under s. 627.428, F.S. In *Progressive Express Insurance Co. v. Schultz*,[40] the 5th DCA held that use of a contingency risk multiplier in a PIP action was improper because the policyholder did not testify that he had any difficulty obtaining legal representation, there was no evidence presented on the issue, and the lawsuit was essentially a straightforward contract case involving $1,315. In *Massie v. Progressive Express Insurance Co.*,[41] the issue before the 1st DCA was whether use of a contingency risk multiplier was proper when the PIP claimant did not testify that she had difficulty obtaining counsel, but expert testimony was offered that the claimant would have had such difficulty without the opportunity for a

---

[34] The federal lodestar approach to determining fee awards was adopted by the Florida Supreme Court in *Florida Patient's Compensation Fund v. Rowe*, 472 So.2d 1145 (Fla. 1985).
[35] *See* Rule 4-1.5(b) of the Rules Regulating the Florida Bar.
[36] *Standard Guaranty Insurance Co. v. Quanstrom*, 555 So.2d 828 (Fla. 1990).
[37] 472 So.2d 1145 (Fla. 1985).
[38] 555 So.2d 828 (Fla. 1990).
[39] *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 483 U.S. 711 (1987).
[40] 948 So.2d 1027 (Fla. 5th DCA 2007).
[41] 25 So.3d 584 (Fla. 1st DCA 2009).

multiplier. On direct appeal, the Circuit Court reversed the trial judge, relying on *Schultz*, holding that the use of a multiplier was improper, and the claimant petitioned for certiorari review. Based on its own precedent, the 1st DCA granted the petition, quashed the order on direct appeal, and affirmed the trial court's use of a contingency risk multiplier based on expert testimony.

### Effect of Proposed Changes

The following provides an overview of the changes made by the bill.

#### Motor Vehicle Crash Reports

The bill provides additional circumstances in which long-form crash reports are required; specifically, when there are any indications of complaints of pain or discomfort by any of the parties or passengers to the motor vehicle accident; when an accident renders a vehicle inoperable such that it must be towed from the accident scene; or when the accident involves a commercial motor vehicle.

Further, both the long-form and short-form reports must include, among other information, the names and addresses of drivers and passengers, and identification of the vehicle in which each was a driver or passenger. For accidents that do not require a long-form and occur on public roadways, law enforcement officers may complete a short-form report or provide a driver-exchange-of-information form to be completed by all drivers and passengers involved in the crash. Drivers of vehicles involved in accidents that do not require a law enforcement report are required to submit a report of the accident to the Department of Highway Safety and Motor Vehicles (DHSMV) within 10 days of the accident.

Long-form and short-form crash reports prepared by law enforcement must be submitted to the DHSMV and may be maintained by the law enforcement officer's agency.

#### No-Fault Motor Vehicle Insurance

The bill revises personal injury protection (PIP) provisions, making the amount of the medical benefit dependent upon the severity of the injury and requiring that initial services and care be provided within 14 days after the motor vehicle accident. Funeral benefits are $5,000 per person, in addition to the $10,000 in medical and indemnity benefits. Medical benefits of up to $10,000 are available for emergency medical conditions[42] diagnosed by specified providers; medical benefits of up to $2,500 are available for non-emergency conditions. The bill also states the Legislature's intent that the provisions and procedures of the No-Fault Law be given full force and effect, regardless of their inclusion in an insurer's forms, on the bill's effective date.

#### PIP Coverage

Under the bill, PIP provides up to $10,000 of coverage (per person) for bodily injury sustained in a motor vehicle accident by the named insured, relatives residing in the same household as the named insured, persons operating the insured motor vehicle, passengers in the insured motor vehicle, and persons struck by the motor vehicle. To be eligible for PIP medical benefits, initial services and care must be received within 14 days after the motor vehicle accident. PIP insurance benefits are payable as follows.
- Up to a limit of $10,000, 80 percent of reasonable medical expenses for:
    1) Initial services and care lawfully provided, supervised, ordered or prescribed by a medical doctor, osteopathic physician, chiropractic physician or that are provided in a

---

[42] As defined in the bill, "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) serious jeopardy to patient health; (b) serious impairment to bodily functions; (c) serious dysfunction of any bodily organ or part. This definition is based on a similar definition in s. 395.002(8), F.S.

  hospital or in a facility that owns, or is wholly owned by a hospital. Initial services and care may also be provided for emergency transport and treatment.
2) Upon referral by any of the above-listed providers, follow-up services and care consistent with the underlying medical diagnosis, which may be provided, supervised, ordered, or prescribed only by a medical doctor, osteopathic physician, chiropractic physician, or dentist, or, to the extent permitted under applicable law and under the supervision of such provider, by a physician assistant or advanced registered nurse practitioner. Follow-up services and care may also be provided by:
    a) A licensed hospital or ambulatory surgical center.
    b) An entity wholly owned[43] by a medical doctor, osteopathic physician, chiropractic physician, or by such practitioner(s) and specified family members.
    c) An entity that owns or is wholly owned, directly or indirectly, by a hospital or hospitals.
    d) A licensed physical therapist, based upon a referral by a provider listed in 2).
    e) A licensed health care clinic that meets specified criteria.
3) Reimbursement for services and care pursuant to 1) or 2) of up to $10,000 if a medical doctor, osteopathic physician, dentist, physician assistant, or an advanced registered nurse practitioner has determined that the injured person had an emergency medical condition.

- Up to a limit of $2,500, 80 percent of reasonable medical expenses when a provider listed in 1) or 2) determines that the injured person did not have an emergency medical condition.

Medical benefits do not include massages or acupuncture, regardless of the provider that performs the service. Massage therapists and acupuncturists are not eligible for reimbursement under PIP.

**Payment of Benefits**

The 30-day period in which to pay PIP benefits is tolled when the insurer has a reasonable belief that a fraudulent insurance act has been committed, and the claimant is provided with written notice within 30 days after submitting the claim that the claim is being investigated for suspected fraud. The insurer has an additional 60 days from the end of the initial 30-day period to conduct its fraud investigation. The insurer must pay (with interest) or deny the claim within 90 days after submission of the claim. Insurers are required to report claims that are denied for suspected fraudulent insurance acts to the Division of Insurance Fraud.

**Examinations Under Oath**

Insureds are required to comply with all terms of the PIP policy including, but not limited to, submitting to an examination under oath (EUO). The scope of questioning under an EUO is limited to relevant information or information that could reasonably be expected to lead to relevant information. Compliance with policy terms is a condition precedent to the receipt of benefits. An insurer that, as a general business practice, as determined by the OIR, requests EUOs without a reasonable basis commits an unfair and deceptive trade practice.

**Medical Reimbursement**

Medical providers and entities may charge the insurer and injured party only a reasonable amount for services and care rendered. Insurers that provide reimbursement under the schedule of charges may use all Medicare coding policies and CMS payment methodologies, including applicable modifiers, to determine the appropriate amount of reimbursement for medical services, supplies, or care, if such coding policy or payment methodology does not constitute a utilization limit. Effective July 1, 2012,

---

[43] As defined in the bill, "entity wholly owned" means a proprietorship, group practice, partnership, or corporation that provides health care services rendered by licensed health care practitioners and in which licensed health care practitioners are the business owners of all aspects of the business entity....

**This document does not reflect the intent or official position of the bill sponsor or House of Representatives.**
STORAGE NAME: h0119z.INBS.DOCX    PAGE: 10
DATE: March 19, 2012

insurers that want to utilize the PIP schedule of maximum charges must amend their forms to include the schedule.

The PIP schedule of maximum charges is amended to provide reimbursement for medical services, supplies, and care provided by ambulatory surgical centers and clinical laboratories at 80 percent of 200 percent of the allowable amount under Medicare Part B. Additionally, reimbursement for durable medical equipment is at 80 percent of 200 percent of the Durable Medical Equipment Prosthetics/Orthotics & Supplies fee schedule of Medicare Part B.

In calculating reimbursements under the schedule of maximum charges, the applicable fee schedule or payment limitation under Medicare is the fee schedule or payment limitation that was in effect on March 1st of the year in which the services, treatment, supplies, or care were rendered, and applies until March 1st of the following year, regardless of any subsequent changes to such fee schedule or payment limitation.

**Limitations on PIP Insurer's Right to Reimbursement**

To be consistent with the distinctions already made in statute between taxicabs and the No-Fault Law, the bill amends s. 627.7405, F.S., by specifying that owners or registrants of taxicabs shall be exempt from this section. Thus, an insurer that provides PIP benefits to an occupant of a taxicab, or to someone struck by a taxicab, will not have the right of reimbursement against the owner or registrant of that taxicab.

**Sanctions**

- Insurers that, as a general business practice, fail to pay valid claims or only pay valid claims upon receipt of a pre-suite demand letter are subject to penalties for engaging in an unfair or deceptive practice. The OIR may order insurers that timely fail to pay PIP claims to pay, with interest, restitution to a policyholder, medical provider, or other claimant. Restitution is in addition to any other penalties allowed by law.
- Health care practitioners found guilty of insurance fraud will have their professional license revoked for 5 years and are precluded from receiving PIP reimbursement for 10 years.
- Persons who present a claim for payment of PIP benefits knowing that the payee submitted a false, misleading, or fraudulent application for health care clinic licensure/exemption from licensure commit insurance fraud.
- Persons who knowingly submit a false or fraudulent application for health care clinic licensure/ exemption from licensure commit a fraudulent insurance act.

**Insurer Responsibilities**

In disputed cases, insurers must notify insureds within 15 days if policy limits have been reached. Insurers are required to create and maintain a log of PIP benefits paid on behalf of each insured and to provide the insured with a copy of the log, upon request, if litigation is commenced.

*Examinations (Mental or Physical) of the Insured*

An insured's refusal or failure to submit to or appear at two examinations (mental or physical) is presumed to be an unreasonable refusal to submit to examination, relieving the insurer of liability to pay subsequent benefits. The presumption, however, is rebuttable, and may be overcome by the claimant upon showing that the refusal or failure to attend the examination was not unreasonable.

**Attorney Fee Awards**

The use of contingency risk multipliers in calculating fee awards in no-fault disputes is prohibited.

The bill provides that attorney fees recovered must comply with prevailing professional standards; not overstate or inflate the number of hours reasonably necessary for a case of comparable skill or complexity; and represent legal services that are reasonable and necessary to achieve the result obtained. Upon request by either party, a judge must make written findings, substantiated by evidence, that any award of attorney fees complies with these factors.

The provisions of the offer of judgment and demand for judgment statute (s. 768.79, F.S.) are made applicable to no-fault disputes.[44]

**PIP Rates**

The OIR is required to contract with an independent consultant within 60 days after the bill becomes a law to calculate expected savings from the bill and to submit a report to the Governor and the Legislature by September 15, 2012.

PIP insurers are required to make rate filings by October 1, 2012, and January 1, 2014, that provide, respectively, a minimum 10 percent and 25 percent decrease in PIP premiums from the effective date of the bill. An insurer that files for less than a 10 percent or 25 percent decrease is required to include in its rate filing a detailed explanation for its failure to achieve such rate reductions. The OIR is required to order insurers that do not provide this detailed explanation to stop writing new PIP policies in Florida.

The OIR is required to perform a comprehensive PIP data call and publish the results by January 1, 2015. It is intended that the data be used by the Legislature to help evaluate market conditions relating to the No-Fault Law and the impact on the market of the reforms made by this act. The data call must address, but is not limited to, the following components of the No-Fault Law:

- Quantity of PIP claims.
- Type or nature of claimants.
- Amount and type of PIP benefits paid and expenses incurred.
- Type and quantity of, and charges for, medical benefits.
- Attorney fees related to bringing and defending actions for benefits.
- Direct earned premiums for PIP coverage, pure loss ratios, pure premiums, and other information related to premiums and losses.
- Licensed drivers and accidents.
- Fraud and enforcement.

**Health Care Clinic Licensure**

For purposes of the No-Fault Law, entities that are excluded from the definition of clinic under the Health Care Clinic Act, ss. 400.990-400.995, F.S., are deemed clinics and are required to be licensed to receive PIP reimbursement. However, this licensing requirement does not apply to:
- Entities wholly owned by medical doctors or osteopathic physicians, or by such physician and his/her spouse, parent, child, or sibling.
- Entities wholly owned by a dentist, or by the dentist and his/her spouse, parent, child, or sibling.

---

[44]The offer of judgment and demand for judgment statute encourages settlement of lawsuits by awarding fees and, thereby, sanctioning the party that refuses to accept a reasonable offer or demand and unnecessarily continues the litigation. If a defendant files an offer of judgment, the plaintiff has 30 days to accept the offer. If the plaintiff does not accept the offer within that time period, the defendant is entitled to reasonable costs and attorney's fees as long as either (1) the judgment is one of no liability or (2) the judgment in favor of the plaintiff is at least 25 percent less than the defendant's offer. If a plaintiff files a demand for judgment, the defendant has 30 days to accept the offer. If the defendant does not accept within that time period and the plaintiff recovers an amount at least 25 percent more than the offer, then the plaintiff is entitled to reasonable costs and attorney's fees.

- Entities wholly owned by chiropractic physicians or by the physician and his/her spouse, parent, child, or sibling.
- Hospitals or ambulatory surgical centers.
- Entities that wholly own or are wholly owned, directly or indirectly, by a hospital or hospitals.
- Entities that are clinical facilities affiliated with an accredited medical school at which training is provided for medical students, residents, or fellows.

**Direct-Support Organization to Fight Motor Vehicle Insurance Fraud**

The Division of Insurance Fraud (DIF) within the Department of Financial Services (DFS) is authorized to establish a direct-support organization to support the prosecution, investigation, and prevention of motor vehicle insurance fraud, to be known as the "Automobile Insurance Fraud Strike Force" (Strike Force). The Strike Force, which must be a not-for-profit corporation incorporated under ch. 617, F.S., and approved by the Department of State, is authorized to raise funds, conduct programs and activities, hold, invest, and administer assets in its name, and make grants and expenditures to state attorneys' offices, the statewide prosecutor, the Agency for Health Care Administration, and the Department of Health to be used exclusively to prosecute, investigate, or prevent motor vehicle insurance fraud. The Strike Force may make grants and expenditures to the extent that they do not interfere with prosecutorial independence or otherwise create conflicts of interest that threaten the success of prosecutions. The Strike Force is precluded from engaging in lobbying activities or from using grants and expenditures for advertising using the likeness or name of any elected official.

The Strike Force is required to operate under a written contract with the DIF, which must provide for:
- DIF approval of the Strike Force's articles of incorporation and bylaws, and its annual budget (which begins on July 1 and ends on June 30th of the following year).
- DIF certification of the Strike Force's compliance with contract terms and that it is acting in a manner consistent with its goals and purposes.
- Allocation of funds to address motor vehicle insurance fraud, and reversion of moneys and property to DIF if the Strike Force ceases to exist, or to the state if DIF ceases to exist.
- Criteria to be used by the Strike Force's board of directors in evaluating the effectiveness of funding to combat insurance fraud.
- Disclosure of material provisions of the contract, including disclosure on all promotional and fundraising publications of the Strike Force.

The Strike Force's board of directors will consist of 11 members as follows: the Chief Financial Officer (CFO) or a designee of the CFO, who will serve as the chair; two state attorneys (one appointed by the CFO and the other by the Attorney General); two representatives of motor vehicle insurers appointed by the CFO; two representatives of local law enforcement agencies (one appointed by the CFO and the other by the Attorney General); two representatives of the types of health care providers who regularly make claims for PIP benefits (one appointed by Speaker of the House of Representatives and one appointed by the President of the Senate); a private attorney that has experience representing PIP claimants (appointed by the President of the Senate); and a private attorney with experience representing PIP insurers (appointed by the Speaker of the House of Representatives).

A board member can be removed for any reason by the officer who appointed the member. An appointment expires when the term of the officer who appointed the member expires or at an earlier time if the member ceases to be qualified.

The DIF may authorize the Strike Force to use its fixed properties and facilities, and may prescribe conditions with which the Strike Force must comply. To be eligible to use DIF's properties and facilities, the Strike Force must provide equal membership and employment opportunities to all persons, regardless of race, religion, sex, age, or national origin.

The DFS is required to adopt rules prescribing the procedures by which the Strike Force is to be governed. For regulatory purposes, insurer contributions to the Strike Force are to be allowed as appropriate business expenses. The Strike Force may hold moneys it receives in a separate depository account in its name, subject to its contract with DIF. Any moneys that DIF receives from the Strike Force are required to be deposited into the Insurance Regulatory Trust Fund.

**Miscellaneous**

- Defines emergency medical condition and entity wholly owned for purposes of the No-Fault Law.
- Requires PIP insurers to repay Medicaid in full within 30 days of receipt of notice that Medicaid has paid such benefits.
- Permits claimants to resubmit bills that have been rejected for alleged deficiencies within 15 days of receipt of denial.
- Provides for a fraud warning on applications for licensure as a health care clinic and exemptions from licensure.
- Removes requirement that permitted electronic submission of data only upon agreement of the parties.
- Prohibits PIP reimbursement for claims generated by unlawful conduct.

## II. FISCAL ANALYSIS & ECONOMIC IMPACT STATEMENT

A. FISCAL IMPACT ON STATE GOVERNMENT:

   1. Revenues:
      None.

   2. Expenditures:
      The bill appropriates $200,000 from the Insurance Regulatory Trust Fund to be used by the OIR to contract with an independent consultant to determine the savings that will result from this legislation.

B. FISCAL IMPACT ON LOCAL GOVERNMENTS:

   1. Revenues:
      None.

   2. Expenditures:
      None.

C. DIRECT ECONOMIC IMPACT ON PRIVATE SECTOR:
   To the extent that the bill eliminates fraud and abuse in the PIP system, the cost of PIP insurance will decrease for Florida motorists.

D. FISCAL COMMENTS:
   PIP insurers are required to make rate filings in 2012 and 2014 that provide for a minimum 10 percent and 25 percent decrease in PIP premiums, and to include a detailed explanation with the rate filing if they do not meet these rate objectives. Insurers that do not decrease rates at these levels and do not provide a detailed explanation will be precluded from writing new PIP policies in Florida.